JOSEPH C. ALM, State Bar No. 294362
Tesla, Inc.
901 Page Avenue
Fremont, California 94538-734
jalm@tesla.com
(650) 681-5000

Counsel for Plaintiff
TESLA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| TESLA, INC., | ) | Case No.: 5:21-cv-00528 |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OF POINTS AND** |
| | ) | **AUTHORITIES IN SUPPORT OF** |
| v. | ) | **PLAINTIFF TESLA, INC.'S *EX PARTE*** |
| | ) | **MOTION FOR TEMPORARY** |
| ALEX KHATILOV. | ) | **RESTRAINING ORDER, ORDER TO** |
| | ) | **SHOW CAUSE RE: PRELIMINARY** |
| Defendant. | ) | **INJUNCTION, AND EVIDENCE** |
| | ) | **PRESERVATION ORDER** |
| | ) | |
| | ) | Date: _____ |
| | ) | Time: _____ |
| | ) | Dept: _____ |
| | ) | Judge: _____ |
| | ) | |
| | ) | Complaint Filed: January 22, 2021 |
| | ) | |

MEMO OF LAW ISO PLAINTIFF'S *EX PARTE* MOTION
FOR TRO, OSC RE: PRELIMINARY INJUNCTION, AND
EVIDENCE PRESERVATION ORDER

**TABLE OF CONTENTS**

I. INTRODUCTION ..........................................................................................................1

II. STATEMENT OF ISSUES ............................................................................................2

III. BACKGROUND ............................................................................................................2

    A. Tesla's Quality Assurance Computer Scripts............................................................2

    B. Defendant Alex Khatilov's Theft of Tesla's Quality Assurance Scripts ................4

IV. ARGUMENT ..................................................................................................................6

    A. A Temporary Restraining Order and Preliminary Injunction is Needed to Enjoin Defendant from Using or Disseminating Tesla's Trade Secrets .................7

        1. Tesla Is Highly Likely to Succeed on the Merits of its Trade Secret Misappropriation and Breach of Contract Claims......................................7

        2. Tesla Will Suffer Imminent and Irreparable Injury Unless the Court Issues Immediate Injunctive Relief ...........................................................10

        3. Tesla's Injuries Substantially Outweigh Any Costs to Defendant for Complying With The Requested TRO and Preliminary Injunction..........12

        4. The Requested Relief Supports The Strong Public Interest in Favor of Protecting Trade Secrets .......................................................................12

    B. No Injunction Bond is Necessary................................................................................13

    C. Expedited Discovery is Needed to Uncover The Full Extent of Defendant's Misappropriation And Prevent Further Dissemination of Tesla's Trade Secrets ................................................................................................................................14

    D. A Preservation Order is Needed to Prevent The Destruction of Essential Evidence ...........................................................................................................................15

V. CONCLUSION ............................................................................................................16

# TABLE OF AUTHORITIES

**CASES**

*Albert's Organics, Inc. v. Holzman*,
    445 F. Supp. 3d 463 (N.D. Cal. 2020) .............................................................................. 10

*Alta Devices, Inc. v. LG Elecs., Inc.*,
    343 F. Supp. 3d 868 (N.D. Cal. 2018) ................................................................................ 9

*Bright Sols. for Dyslexia, Inc. v. Doe*,
    No. 15-cv-01618-JSC,
    2015 U.S. Dist. LEXIS 117252 (N.D. Cal. Sept. 1, 2015) ................................................ 15

*Comet Techs. USA Inc. v. Beuerman*,
    No. 18-CV-01441-LHK,
    2018 U.S. Dist. LEXIS 224356 (N.D. Cal. Mar. 15, 2018) ....................................... *passim*

*Cone v. Hankook Tire Co.*,
    No. 1:14-cv-01122-JDB-egb,
    2015 U.S. Dist. LEXIS 198716 (W.D. Tenn. July 31, 2015) .............................................. 9

*Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*,
    No. 2:13-cv-00784-MCE-DAD,
    2013 U.S. Dist. LEXIS 70098 (E.D. Cal. May 16, 2013) ............................................ 11, 12

*Henry Schein, Inc. v. Cook*,
    No. 16-cv-03166-JST,
    2016 U.S. Dist. LEXIS 81369 (N.D. Cal. June 22, 2016) ............................... 8, 10, 13, 15

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003) ............................................................................................ 13

*Posdata Co. v. Kim*,
    No. C-07-02504 RMW,
    2007 U.S. Dist. LEXIS 48359 (N.D. Cal. June 27, 2007) ..................................... 9, 14, 15

*Pyro Spectaculars N., Inc. v. Souza*,
    861 F. Supp. 2d 1079 (E.D. Cal. 2012) ...................................................................*passim*

*TGG Mgmt. Co. v. Petraglia*,
    No. 19-cv-2007-BAS-KSC,
    2020 U.S. Dist. LEXIS 6376 (S.D. Cal. Jan. 14, 2020) ...................................................... 9

*TMX Funding, Inc. v. Impero Techs., Inc.*,
    No. C 10-00202 JF (PVT),
    2010 U.S. Dist. LEXIS 37064 (N.D. Cal. Mar. 17, 2010) ................................... 9, 10, 14

*Vacco Indus., Inc. v. Van Den Berg*,
    5 Cal. App. 4th 34 (1992) .................................................................................................. 9

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................................. 6

**STATUTES**

18 U.S.C. § 1836 ............................................................................................................................ 7

18 U.S.C. § 1839 ...................................................................................................................... 7, 8

Cal. Civ. Code § 3426 .............................................................................................................. 7, 8

**RULES**

Fed. R. Civ. P. 65(c) ..................................................................................................................... 13

## I.   INTRODUCTION

Plaintiff Tesla, Inc. ("Tesla") needs urgent relief from this Court to (1) prevent a terminated employee, Defendant Alex Khatilov, from disseminating trade secrets he stole from Tesla during his brief (two week) employment at the company; (2) uncover the full scope of his theft; and (3) stop him from destroying the evidence of his theft. Tesla seeks this relief because it has no choice: it must take all steps to protect its trade secrets from theft—in this case, premeditated theft by a (now) former employee who brazenly stole thousands of trade secret computer scripts that took Tesla years to develop. Worse, the Defendant then lied about it and tried to delete the evidence of his theft when quickly confronted by Tesla's security team, forcing Tesla to bring this action.

Tesla hired Defendant as a software automation engineer on December 28, 2020. Within three days, he began stealing thousands of highly confidential software files from Tesla's secure internal network, transferring them to his personal cloud storage account on Dropbox, to which Tesla has no access or visibility. The files consist of "scripts" of proprietary software code that Tesla has spent years of engineering time to build. These scripts, when executed, automate a broad range of functions throughout Tesla's business. Only a select few Tesla employees even have access to these files. As a member of that group, Defendant took advantage of that access to downloaded files unrelated to his job.

Tesla's information security personnel detected Defendant's unauthorized download on January 6, 2021 and confronted Defendant that day and interviewed him. During this interview he repeatedly claimed that he had only transferred a couple personal administrative documents. After being prompted, he gave Tesla investigators access to view his Dropbox account, where they discovered Defendant's claims were outright lies: the Tesla investigators found thousands and thousands of Tesla's confidential computer scripts in his Dropbox. Defendant then claimed he somehow "forgot" about the thousands of other files he stole (almost certainly another lie). Even worse, it became apparent that Defendant had brazenly attempted to destroy the evidence by hurriedly deleting the Dropbox client and other files during the beginning of the interview when investigators were attempting to remotely access his computer. Fortunately, the investigators were able to eventually view the Dropbox account and instructed Defendant to delete all Tesla files that

still remained. But Tesla's ability to rectify Defendants' wrongdoing ended there. Tesla does not know whether Defendant took additional files, whether he copied files from the Dropbox account to other locations in the days before he was caught, or whether he sent any of the files to other persons or entities. Indeed, as soon as Defendant uploaded the stolen files to his Dropbox account, he could have shared or retransferred those files to anyone or any other storage media (whether an external thumb drive, another computer, a mobile device, or another cloud-based storage system). And Tesla would have had no way to know that.

In light of Defendant's premeditated trade secret theft, lying, and obstruction Tesla requests urgent, tailored relief from this Court (1) enjoining Defendant from using or disclosing any Tesla trade secrets that remain in his possession, (2) enjoining him from further destroying evidence, and (3) ordering expedited discovery to quickly determine the full extent of his misconduct.

## II.   STATEMENT OF ISSUES

1) Whether the Court should issue a temporary restraining order, followed by a preliminary injunction, enjoining Defendant from using or disclosing Tesla's trade secrets;

2) Whether the Court should require a bond for issuance of the requested injunction;

3) Whether there is good cause for expedited discovery so Tesla can uncover the full extent of Defendant's theft and prevent further dissemination of its trade secrets; and

4) Whether an evidence preservation order is needed to prevent Defendant from further destroying relevant evidence.

## III.   BACKGROUND

### A.   Tesla's Quality Assurance Computer Scripts

Tesla develops, manufactures, sells, and leases electric vehicles and energy generation and storage systems. Among Tesla's numerous innovations is its development of automated "Quality Assurance" processes that run a broad range of business functions without human effort – including tasks such as procurement, materials planning and processing, payables, and purchasing. Declaration of Golda Arulappan ¶ 3. Tesla employs a team of Quality Assurance Engineers who communicate with business leaders to identify what tasks need to be automated, and then write computer scripts to automate those tasks. *Id.* ¶ 2. The scripts are unique to Tesla and run in its

FOR TRO, OSC RE: PRELIMINARY INJUNCTION, AND
EVIDENCE PRESERVATION ORDER

back-end software, called WARP Drive. *Id.* ¶ 3. Most of Tesla's manufacturing cycle is effectively managed by these scripts – from ordering parts to delivering cars. *Id.*

Developing this complex system is expensive and time-consuming. Tesla has spent roughly 200 man-years of work to develop its automation scripts – the cumulative hours spent by its Quality Assurance Engineering team over the past twelve years. *Id.* ¶ 4. The engineers' work is also guided by senior business leaders who identify what tasks need to be automated – another large and valuable investment of Tesla's time. *Id.*

The scripts are extremely valuable to Tesla – and they would be to a competitor. Access to these scripts would enable engineers at other companies to reverse engineer Tesla's processes to create a similar system in a fraction of the time and with a fraction of the expense. *Id.* ¶ 13. Third-party engineers could not compose these scripts based on public information. *Id.* The scripts also would inform Tesla's competitors of which systems it believes are important and valuable to automate and how to automate them – providing a roadmap to replicate Tesla's innovation. *Id.*

For these reasons, Tesla takes extensive measures to ensure that its Quality Assurance scripts remain strictly confidential and are never shared externally. *Id.* ¶ 5. Tesla protects its confidential, proprietary, and trade secret information with stringent information security policies and practices. Declaration of David Schertzer ¶ 23; Declaration of Jenna Ferrua ¶¶ 5-7. Its network and servers are password-protected, firewall-protected, and accessible only to current Tesla employees with proper credentials. Schertzer Decl. ¶ 23. Even within Tesla, access to the scripts is limited only to members of the Quality Assurance team, which amounts to about 40 people among the roughly 50,000 Tesla employees. Arulappan Decl. ¶ 5. The engineers who do have access to these scripts are not permitted to download them to personal devices or cloud storage. *Id.* Tesla also employs an Information Security team that monitors its systems for suspicious activity, including unauthorized downloading of trade secrets. *Id.*

Tesla's engineers also sign a comprehensive set of agreements and policies as a condition of their employment which require them to protect Tesla's confidential information and not to disclose or misuse that information, including the Quality Assurance scripts. Ferrua Decl. ¶¶ 5-7. These include: an Employee Nondisclosure And Inventions Assignment Agreement ("NDA"),

which requires employees to hold Tesla's information "in strictest confidence" and prohibits them from using or disclosing any Tesla "Proprietary Information," including "technical data, trade secrets, know-how, … plans, designs, … methods, processes, … data, programs, … and other business information", *id.* ¶¶ 5-6 & Ex. A at 6 ¶ 1; and an Internet Usage Policy that prohibits "transmitting, copying, downloading, or removing trade secret, proprietary, or confidential business information of Tesla without written authorization." *Id.* ¶ 7 & Ex. B at 1.

### B. Defendant Alex Khatilov's Theft of Tesla's Quality Assurance Scripts

Defendant Alex Khatilov began working for Tesla as a Senior Quality Assurance Engineer on December 28, 2020. Arulappan Decl. ¶ 7. His role was to prepare and revise computer scripts to help automate Tesla's Environmental Health and Safety ("EHS") systems. *Id.* These EHS scripts concern systems that are separate from those on WARP Drive, but they do interact with the WARP Drive software. *Id.* ¶ 10. Like all other Tesla employees, Defendant signed a Tesla non-disclosure agreement ("NDA"), indicating his agreement to abide by its terms. Ferrua Decl. ¶ 4 & Ex. A.

Tesla employs a dedicated Information Security team that, among other things, monitors Tesla's infrastructure and networks for breaches of security. It also employs monitoring software to assist in detecting breaches. On the morning of January 6, 2021, Tesla's Information Security team detected that Defendant had downloaded 26,377 files from Tesla networks and transferred them to his personal cloud storage account on Dropbox. Schertzer Decl. ¶ 2.[1] Defendant began transferring the files on December 31, 2020 – just three days after he was hired. *Id.* The matter was immediately escalated to a Senior Security Intelligence Investigator, David Schertzer, and to Defendant's supervisor and Senior Manager of Software Quality Assurance Engineering, Golda Arulappan. Mr. Schertzer and Ms. Arulappan quickly determined that the file transfer was

---

[1] Tesla's investigation is ongoing. Although the monitoring software detected the transfer of over 26,000 files, a portion of these are likely to be duplicates or artifacts of transfer. As of today Tesla believes at least 6,300 files were included in the transfer. Tesla will provide further information for the Court as it continues to analyze the data. Declaration of John Shumway ¶¶ 2-4.

unauthorized, and that it comprised a complete set of all automation scripts developed by Tesla's Quality Assurance engineers over the last twelve years. Schertzer Decl. ¶ 5; Arulappan Decl. ¶ 9. Also concerning: those scripts had nothing to do with Defendant's role in preparing EHS scripts, meaning there was no plausible business justification for his downloads. Arulappan Decl. ¶ 10.

Later that day, Mr. Schertzer and Ms. Arulappan interviewed Defendant (who was working remotely due to COVID-19) via Microsoft Teams, a videoconferencing program. Schertzer Decl. ¶ 6. Investigator John Shumway joined the call as well. *Id.* Defendant was terse and evasive throughout the interview, providing mostly one-word answers, feigning ignorance, and repeatedly lying to the investigators. *Id.* ¶ 18; Ferrua Decl. ¶ 2. When asked what files he uploaded to his Dropbox account, he claimed twice that he only uploaded personal administrative documents, such as his scanned passport and W-4. Schertzer Decl. ¶ 9; Ferrua Decl. ¶ 2.

Mr. Schertzer then prompted Defendant to share his laptop screen, but Defendant delayed accepting the request for over a minute, thus not allowing the investigators to see the screen or view his Dropbox account. Schertzer Decl. ¶ 11. During this time, Defendant could be seen rapidly clicking and typing on his laptop, appearing to delete information in a hurry while speaking with the investigators and ignoring their request to inspect his computer. *Id.* When Defendant finally shared his screen, he claimed he had "already deleted" the Dropbox desktop application during the interview (which had enabled him to rapidly upload files on his hard drive to the Dropbox account). *Id.* ¶ 12. The investigators – who were able to view Defendant's screen but not able to actually control his mouse or keyboard – instructed Defendant to display all files that had already been transferred to Dropbox, which revealed folders containing a large amount of non-administrative material, including many of the Quality Assurance scripts that were detected by Tesla's monitoring software. *Id.* ¶ 13. The investigators also instructed Defendant to log into his Dropbox account on the Dropbox website, where the same confidential Tesla files were still available through his cloud storage account. *Id.* Defendant agreed to delete the remainder of those files on his laptop and his Dropbox account – or at least, the ones that investigators were able to find during the call. *Id.* ¶ 14.

Memo of Law iso Plaintiff's *Ex Parte* Motion   -5-
for TRO, OSC re: Preliminary Injunction, and
Evidence Preservation Order

Mr. Schertzer then informed Defendant that, despite his claims to the contrary, Tesla's Information Security team detected that he removed over 26,000 highly confidential, non-administrative files from the Tesla network over the course of several days. *Id.* ¶ 16. Defendant claimed – incredibly – that he "forgot" he had downloaded them. *Id.*; Ferrua Decl. ¶ 2. Defendant was also unable to articulate a business reason for any of the downloads. Schertzer Decl. ¶ 17. Tesla terminated Defendant's employment in light of his blatant theft and his repeated lying and obfuscation throughout the investigation. *Id.* ¶ 20; Ferrua Decl. ¶ 3.

But Tesla's concerns remain. Although investigators were able to watch Defendant delete information they found on Defendant's laptop and in his Dropbox account, Tesla does not know whether he took additional files, whether the information he downloaded was previously transferred from Dropbox to other locations, or whether he shared the information with anyone else before he was caught. Schertzer Decl. ¶ 21.[2]

### IV. ARGUMENT

To obtain preliminary relief Tesla must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1087 (E.D. Cal. 2012) (citation omitted). "The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Comet Techs. USA Inc. v. Beuerman*, No. 18-CV-01441-LHK, 2018 U.S. Dist. LEXIS 224356, at *5 (N.D. Cal. Mar. 15, 2018).

---

[2] Tesla's Information Security Team will review Defendant's work laptop once it is received, although it does not anticipate that this analysis will be capable of revealing anything concerning his cloud-based Dropbox account. Tesla will update the Court if it uncovers any other relevant information. Shumway Decl. ¶ 5.

Both the federal Defend Trade Secrets Act (DTSA) and the California Uniform Trade Secrets Act (CUTSA) authorize injunctions to enjoin or prevent "any actual or threatened misappropriation" of trade secrets. 18 U.S.C. § 1836(b)(3)(A); Cal Civ. Code § 3426.2(a) (same). This Court should do so here to prevent irreparable damage to Tesla, to uncover the full scope of Defendant's misconduct, and to stop Defendant from covering his tracks.

### A. A Temporary Restraining Order and Preliminary Injunction is Needed to Enjoin Defendant from Using or Disseminating Tesla's Trade Secrets

#### 1. Tesla Is Highly Likely to Succeed on the Merits of its Trade Secret Misappropriation and Breach of Contract Claims

Tesla's claims for trade secret misappropriation and breach of contract are clear and compelling. Misappropriation of a trade secret is defined both under federal and state law as, among other things: (a) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"; or (b) "disclosure or use of a trade secret of another without express or implied consent by a person who … used improper means to acquire knowledge of the trade secret[.]" 18 U.S.C. § 1839(5); *see also* Cal. Civ. Code § 3426.1(b) (same). "Improper means" includes "theft," "misrepresentation," or "breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6); *see also* Cal. Civ. Code § 3426.1(a) (same). Similarly, and as a condition of his employment, Defendant agreed to an NDA and an employment agreement which forbade him from misappropriating Tesla's confidential information. Ferrua Decl. ¶¶ 4-5 & Ex. A at 3, 6 ¶ 1.

That is exactly what Defendant did. As detailed above, within days of being hired he systematically downloaded at least 6,300 and up to 26,000 files containing Quality Assurance scripts from Tesla's network and transferred them to his personal Dropbox account – a complete set of all automation scripts produced by Tesla's Quality Assurance Engineering team over the past twelve years. Schertzer Decl. ¶ 5; Arulappan Decl. ¶ 9. Defendant had no authorization to make that transfer and no business purpose for doing so – indeed, the files he downloaded had nothing to do with the role for which he was hired. Schertzer Decl. ¶ 17; Arulappan Decl. ¶ 10.

His deceptive behavior, including his lies and immediate attempts to destroy evidence, shows that he knew his actions were improper.

Courts have frequently found a likelihood of trade secret misappropriation and/or breach of contract – and issued TROs and preliminary injunctions accordingly – under similar facts. *See, e.g.*, *Comet*, 2018 U.S. Dist. LEXIS 224356 (granting motion for TRO, expedited discovery, and evidence preservation where employee downloaded over a hundred confidential documents from plaintiff's servers, saved them to an external memory device, lied about it, and attempted to conceal his misconduct when confronted); *Pyro*, 861 F. Supp. 2d 1079 (granting TRO and motion for expedited discovery where employee downloaded plaintiff's confidential documents and information); *Henry Schein, Inc. v. Cook*, No. 16-cv-03166-JST, 2016 U.S. Dist. LEXIS 81369 (N.D. Cal. June 22, 2016) (granting TRO and preliminary injunction enjoining defendant from accessing or using former employer's trade secrets that she downloaded and emailed to herself in violation of her employment agreement, and ordering defendant to preserve all evidence relating to her misappropriation).

There is also no question that the scripts reflect Tesla trade secrets. Trade secrets constitute all forms of financial, technical, economic, engineering, and other types of business information, "including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d); *see also* 18 U.S.C. § 1839(3) (same under DTSA, except also requiring that such information not be "readily ascertainable through proper means").

As explained above, the files at issue are comprised of confidential software scripts written by Tesla's Quality Assurance engineers to automate a wide range of internal business functions. Arulappan Decl. ¶ 2. The scripts are the product of roughly 200 man-years of expensive and time-consuming effort. *Id.* ¶ 4. They are kept strictly confidential and are never shared externally. *Id.* ¶ 5. Although many companies employ automated quality assurance functions, the scripts at issue are unique to Tesla, are not publicly available, and could not be ascertained or recreated based on

public information. *Id.* ¶¶ 5, 13. Access to the scripts would be invaluable to Tesla's competitors by enabling them to gain insight into Tesla's innovation and to recreate a similar automated system with minimal effort and expense. *Id.* ¶ 13. Courts routinely find that this sort of information qualifies as a trade secret. *See Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 881-82 (N.D. Cal. 2018) ("quality control method" sufficiently pled as a trade secret); *TGG Mgmt. Co. v. Petraglia*, No. 19-cv-2007-BAS-KSC, 2020 U.S. Dist. LEXIS 6376, at *10-12 (S.D. Cal. Jan. 14, 2020) ("[q]uality assurance materials" qualified as trade secrets); *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 42, 51 (1992) (substantial evidence supported conclusion that "quality controls and testing procedures" were trade secrets); *Cone v. Hankook Tire Co.*, No. 1:14-cv-01122-JDB-egb, 2015 U.S. Dist. LEXIS 198716, at *10 (W.D. Tenn. July 31, 2015) (finding "quality assurance systems are established trade secrets").

Tesla also undertakes extensive measures to protect the secrecy of its scripts, including (as explained above) requiring employees to sign stringent confidentiality agreements and data use policies, forbidding downloads to personal devices or cloud accounts, using password and firewall-protected servers, limiting internal access to Quality Assurance engineers (who comprise a tiny fraction of Tesla's workforce), and maintaining an Information Security team that monitors systems for suspicious activity – which is how Tesla caught Defendant here. Arulappan Decl. ¶¶ 5-6; Schertzer Decl. ¶¶ 3, 22-23; Ferrua Decl. ¶¶ 5-7. These measures are more than reasonable under the circumstances to establish that the scripts at issue are protected as trade secrets. *See Posdata Co. v. Kim*, No. C-07-02504 RMW, 2007 U.S. Dist. LEXIS 48359, at *14-15 (N.D. Cal. June 27, 2007) (finding, for TRO purposes, that plaintiff's use of confidentiality agreements and internal security measures constituted reasonable measures to protect trade secrets); *Pyro*, 861 F. Supp. 2d at 1090-91 (finding reasonable measures based on use of confidentiality agreements, maintenance of secure network servers, password-restricted access, and limited access by job function); *TMX Funding, Inc. v. Impero Techs., Inc.*, No. C 10-00202 JF (PVT), 2010 U.S. Dist. LEXIS 37064, at *13-14 (N.D. Cal. Mar. 17, 2010) (finding reasonable measures based on use of confidentiality agreements and restricted employee access).

### 2. Tesla Will Suffer Imminent and Irreparable Injury Unless the Court Issues Immediate Injunctive Relief

"[A] Court's conclusion that [a] Plaintiff is likely to prevail on its trade secret misappropriation claims supports a finding of irreparable harm." *Comet*, 2018 U.S. Dist. LEXIS 224356, at *13. "This is because such losses would be difficult to quantify in terms of economic value." *Henry Schein*, 2016 U.S. Dist. LEXIS 81369, at *25.

Indeed, Tesla stands to suffer injuries that cannot be repaired or quantified if the stolen trade secrets are further misappropriated. As noted above, it took over a decade for Tesla's engineers to automate its systems. Arulappan Decl. ¶ 4. If a competitor accesses these scripts it could catch up with Tesla by recreating those systems with little time and cost. *Id.* ¶ 13. It would also give those competitors invaluable insight into innovative business practices that have helped vault Tesla to the top of the automobile and clean energy industries, including what processes should be automated and how to automate them. *Id.* There would be no way for Tesla to undo the loss of this competitive advantage.[3]

Defendant will likely argue that there is no risk of irreparable harm because he already deleted the scripts from his Dropbox account. That provides little comfort here. Although Tesla's investigators were able (they think) to watch Defendant delete the files they found on Defendant's laptop and in his Dropbox account, they were unable to remotely control his mouse and keyboard to ensure that everything was deleted. Schertzer Decl. ¶¶ 14-15. Tesla also does not know whether Defendant took additional files, whether the information was further transferred from Dropbox to other locations, or whether Defendant shared the information with anyone else. *Id.* ¶ 21. As soon as Defendant uploaded the files to his Dropbox account, he had the ability to instantly share or retransfer those files from Dropbox to any other person or location at any time – including loading

---

[3] Although there is a split on the issue, some "courts in this district have presume[d] that [a] Plaintiff will suffer irreparable harm if its proprietary information is misappropriated." *Comet*, 2018 U.S. Dist. LEXIS 224356, at *13 (citations omitted) (Koh, D.J.); *accord, e.g.*, *TMX Funding*, 2010 U.S. Dist. LEXIS 37064, at *24 (same) (Fogel, D.J.); *Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 474 (N.D. Cal. 2020) (same) (Hamilton, D.J.). Tesla needs no presumption here in light of the clear irreparable harm it will suffer without relief from the Court.

them onto a thumb drive, emailing them, syncing them to another computer, transferring them to an entirely different cloud-based account, or even printing them. *Id.* Tesla had no way to monitor that activity away from its servers, which Defendant could have done at any time before he purportedly deleted the files from Dropbox. *Id.* Defendant's assurances mean nothing, given his track record of dishonesty and evidence destruction. Within days of being hired he downloaded troves of trade secrets that had nothing to do with his job function, and then uploaded the information to a personal account that Defendant could have shared with anyone, at any time. *Id.* ¶ 2. When Tesla confronted him, he lied about the content that he downloaded, twice claiming that the files were merely of a personal and administrative nature. *Id.* ¶ 9. He then resisted investigators' requests to see his computer screen and attempted to destroy the evidence by deleting files before Tesla could gain access to his system. *Id.* ¶¶ 11, 12. When they did gain access, he lied again, claiming that he "forgot" about downloading thousands of scripts just a few days earlier. *Id.* ¶ 16.

In light of the fact that Defendant's theft appears premeditated, he repeatedly lied to cover it up, and he tried to obstruct Tesla's investigation, there is grave risk Defendant transferred these files elsewhere. And if he did, or if Tesla did not uncover all of Defendant's theft, Tesla will suffer irreparable harm unless the Court takes immediate action to stop any further misuse or dissemination of its trade secrets. Indeed "[i]n moving for a preliminary injunction, Plaintiffs are not required to prove that misappropriation actually has occurred – Plaintiffs need only make a clear showing that misappropriation *likely* occurred." *Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*, No. 2:13-cv-00784-MCE-DAD, 2013 U.S. Dist. LEXIS 70098, at *26-34 (E.D. Cal. May 16, 2013) (emphasis in original) (granting preliminary injunction where defendants downloaded massive amounts of confidential information in a span of several days, demonstrating that "Defendants likely attempted to misappropriate" plaintiff's data); *Comet*, 2018 U.S. Dist. LEXIS 224356, at *14 ("Plaintiff's concerns are justifiably heightened because of Defendant's conduct before his exit interview and Defendant's false representations to Plaintiff during Defendant's exit interview.").

### 3. Tesla's Injuries Substantially Outweigh Any Costs to Defendant for Complying With The Requested TRO and Preliminary Injunction

The balance of hardships tip sharply, indeed entirely, in Tesla's favor. "Courts have found that the balance of hardships tips in favor of a plaintiff seeking an injunction which would merely prohibit [the defendant] from misappropriating the trade secrets of [the plaintiff]." *Farmers Ins. Exch.*, 2013 U.S. Dist. LEXIS 70098, at *38 (citations omitted); *see also, e.g.*, *Comet*, 2018 U.S. Dist. LEXIS 224356, at *14-15 (finding TRO "will result in little meaningful hardship to Defendant" because "[t]he proprietary information at issue belongs to Plaintiff, not Defendant. Thus, Plaintiff has a very strong interest in ensuring that the information is not disclosed. On the other side, Defendant has little interest in disclosing or using the information because such disclosure or use is unauthorized."); *Pyro*, 861 F. Supp. 2d at 1092 (finding a preliminary injunction "would not cause any significant hardship to defendant, because it would essentially only require him to abide by existing law regarding the unauthorized use of another's trade secrets," and "whatever harm defendant may suffer by such a narrow injunction is slight when compared to the intangible harm PSI would suffer").

Here, too, Defendant would suffer no prejudice by being enjoined from misusing or disseminating trade secrets that he has no right to possess in the first place. Defendant would also suffer no prejudice from being ordered to return any other Tesla materials in his possession. To the extent Defendant may incur any costs or inconvenience in complying with the injunction, it pales in comparison to the irreparable harm that Tesla stands to suffer.

### 4. The Requested Relief Supports The Strong Public Interest in Favor of Protecting Trade Secrets

The public interest factor weighs heavily in Tesla's favor as well. "[T]he public has a strong interest in ensuring trade secrets are protected. Courts have recognized this strong public interest in the injunctive relief context." *Comet*, 2018 U.S. Dist. LEXIS 224356, at *15-16 (collecting cases); *see also, e.g.*, *Pyro*, 861 F. Supp. 2d at 1092-93 (California "has a strong policy in favor of protecting trade secrets," and thus, "an injunction specifically focused on preventing

misuse of PSI's trade secrets to solicit PSI's customers would serve the policy of protecting trade secrets while simultaneously allowing lawful competition").

Tesla's sole purpose in bringing this motion is to protect its trade secrets and mitigate its damages. The requested injunction is tailored to prevent and uncover unlawful activity, and it would not bind anyone other than the Defendant. The injunction also would not prohibit Defendant from seeking legitimate employment. The public interest is served by such a narrow and targeted request. *Henry Schein*, 2016 U.S. Dist. LEXIS 81369, at *27-28 ("Here, the injunction is limited only to the Defendant's conduct. Moreover, … the public interest is served by enabling the protection of trade secrets.").

### B. No Injunction Bond is Necessary

Federal Rule of Civil Procedure 65(c) "invests the district court with discretion as to the amount of security required, if any." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citations omitted). "The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.*

No bond is needed here because, as explained above, the Defendant will suffer no harm from complying with an injunction that simply prohibits him from misappropriating trade secrets that do not belong to him. *See Comet*, 2018 U.S. Dist. LEXIS 224356, at *16-17 (no bond necessary for a TRO barring defendant from using Plaintiff's trade secrets because "Defendant was never entitled to disclose or use the information he took from Plaintiff," and thus, "there is no likelihood of harm because the TRO would simply enjoin Defendant from doing something Defendant never had a right to do in the first place"); *Pyro*, 861 F. Supp. 2d at 1098 (requiring no bond upon issuance of preliminary injunction enjoining use of trade secrets downloaded from former employer, because "the narrow injunction to be entered will not preclude defendant from working in his chosen occupation").[4]

---

[4] Defendant also acknowledged that violation of the NDA may cause Tesla irreparable harm "and that the Company shall therefore have the right to enforce this Agreement and any of its provisions by injunction, specific performance, or other equitable relief, without bond …." Ferrua Decl. Ex. A at 8 ¶ 6.

### C. Expedited Discovery is Needed to Uncover The Full Extent of Defendant's Misappropriation And Prevent Further Dissemination of Tesla's Trade Secrets

In addition to a TRO enjoining further misappropriation of its trade secrets, Tesla also needs immediate discovery to determine whether Defendant stole any other information, kept copies of files that Tesla was not able to find, and/or disclosed Tesla's trade secrets to anyone else. Specifically – and as further detailed in the Proposed Order – Tesla requests (1) an immediate return of all Tesla property in his possession; (2) an identification of all other media on which he stored Tesla's trade secrets; (3) the production of all such media for forensic imaging; (4) provision of all login information needed to access that media; and (5) an identification of any other persons, entities, or locations where Defendant may have disseminated or disclosed Tesla's information.

"The standard for expedited discovery is 'good cause.' Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Comet*, 2018 U.S. Dist. LEXIS 224356, at *19-21 (citation omitted). Courts have repeatedly ordered such discovery in analogous circumstances where an employee steals massive amounts of trade secrets from an employer. *Id.* (finding good cause for expedited discovery "so that Comet can better understand the nature and extent of Beuerman's misappropriation and use of Comet's trade secrets," including an identification of the information and property taken, the location of that property or information, and an identification of where information had been disclosed); *see also, e.g.*, *TMX Funding*, 2010 U.S. Dist. LEXIS 37064, at *25-26 (granting preliminary injunction requiring defendants "to return the Teledex laptops and any other equipment or materials containing [its] proprietary, confidential, or trade secret information"); *Posdata*, 2007 U.S. Dist. LEXIS 48359, at *27-28 (granting request for expedited discovery "to further uncover Defendants' unlawful conduct prior to the preliminary injunction hearing"); *Pyro*, 861 F. Supp. 2d at 1093-94 (maintaining TRO "requiring collection, production, and the subsequent destruction of any remnants of all PSI documents, databases, and information in defendant's actual or constructive possession, or in the actual or constructive possession of those acting in concert or active participation with defendant").

1  Defendant's immediate and extensive downloading of Tesla's scripts within days of being
2  hired, combined with his repeated attempts to deceive investigators and cover up his conduct,
3  indicates a premeditated plot to steal sensitive information from Tesla and use or disseminate it
4  for other purposes.  Tesla must know what Defendant did with that information as soon as possible
5  in order to mitigate its damages.  *See Comet*, 2018 U.S. Dist. LEXIS 224356, at *19-21 ("Quickly
6  determining what information Defendant removed from Plaintiff, and whether and how Plaintiff's
7  information is being used by Plaintiff's competitors is essential in order to minimize any harm to
8  Plaintiff's competitive position.").

### D. A Preservation Order is Needed to Prevent The Destruction of Essential Evidence

The Court may issue an evidence preservation order beyond the ordinary duty to preserve evidence if there is "a significant concern that potentially relevant evidence will be destroyed causing harm to the opposing party." *Bright Sols. for Dyslexia, Inc. v. Doe*, No. 15-cv-01618-JSC, 2015 U.S. Dist. LEXIS 117252, at *6 (N.D. Cal. Sept. 1, 2015) (citations omitted).

That concern is well-founded here, because the Defendant has already demonstrated a proclivity to destroy evidence.  The very first thing he did upon being confronted by Tesla was lie about the files he had downloaded, block investigators from accessing his computer, and hastily delete evidence.  Schertzer Decl. ¶¶ 11-12.  An evidence preservation order is necessary to prevent him from going any further.  *See Comet*, 2018 U.S. Dist. LEXIS 224356, at *17-19 (issuing preservation order where defendant downloaded plaintiff's information to personal storage media and lied about it when confronted; "Given this backdrop, the Court finds that there is a significant risk that Defendant will destroy the information at issue," that "irreparable harm is likely to result to Plaintiff if the evidence is destroyed because Plaintiff will be unable to determine the extent of the damage to its business," and that "it is within Defendant's capacity to maintain the evidence that remains because all Defendant needs to do is return a physical device to Plaintiff, or refrain from deleting digital information."); *Henry Schein*, 2016 U.S. Dist. LEXIS 81369 at *31-32 (ordering defendant on TRO and preliminary injunction to preserve evidence concerning misappropriation of trade secrets); *Posdata*, 2007 U.S. Dist. LEXIS 48359, at *28 (ordering both

parties as part of trade secret TRO "to preserve all evidence potentially relevant to a claim or defense").

## V. CONCLUSION

For the foregoing reasons, Tesla respectfully requests that the Court grant its emergency application for a Temporary Restraining Order, Order to Show Cause, and Evidence Preservation Order as set forth in the Proposed Order.

Dated: January 22, 2021

*s/ Joseph Alm*
Joseph Alm

Joseph Alm
State Bar # 294362
Tesla, Inc.
901 Page Avenue
Fremont, California 94538-734
jalm@tesla.com
(650) 681-5000

*Counsel for Plaintiff*
Tesla, Inc.